1
2
3
4
5
6
7
8                          UNITED STATES DISTRICT COURT

9                     FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   Daniel Libraty,                              No. 1:20-cv-01764-KJM-SAB

12                        Plaintiff,              ORDER

13         v.

14   Douglas A. Collins, et al.,

15                        Defendants.

16

17         Plaintiff Daniel Libraty, a medical doctor, received a tentative offer to work as an in-

18   house infectious disease specialist at healthcare facilities operated by the Department of Veterans

19   Affairs in Central California.  His offer was ultimately revoked.  He had suffered a spontaneous

20   cerebellar hemorrhage several years before, and as a result, there was a gap in his history of

21   clinical practice.  He alleges in this case that his offer was revoked because of that gap, and he

22   claims the revocation amounted to disability discrimination in violation of federal and state law.

23   As explained in this order, nothing before the court supports the conclusion he could prove that

24   claim at trial.  The defendants' motions for summary judgment are therefore **granted**.[1]

---

[1] Douglas A. Collins was substituted automatically as a defendant in his official capacity
as the Secretary of Veterans Affairs under Federal Rule of Civil Procedure 25(d).

1

1    **I.    BACKGROUND**

2        The U.S. Department of Veterans Affairs operates several healthcare facilities in Central

3    California, which together are known as the Central California Health Care System, or simply the

4    "Fresno VA."  *See* U.S. Dep't Veterans Affairs, *VA Central California Health Care* (May 1,

5    2025).[2]  These facilities include a hospital, three community clinics and a community living

6    center.  *See id.*; *see also* Correa 30(b)(6) Dep. at 17, ECF No. 31-6.

7        This case arises from the Fresno VA's efforts to find and hire an infectious disease

8    specialist in 2019 and 2020.  It did not have an in-house specialist at the time.  Libraty Dep. at 54,

9    ECF No. 31-4; Wallace Dep. Ex. 1 ¶ 4, ECF No. 31-5.  Instead, it had a contract with an

10   organization within the University of California, San Francisco known as the Central California

11   Faculty Medical Group, "UCSF" for ease of reference.  Wallace Dep. Ex. 1 ¶ 4; Bukhari Dep. at

12   16, 18, ECF No. 31-8.  Under that contract, infectious disease doctors from the UCSF system saw

13   patients in the Fresno VA.  Wallace Dep. Ex. 1 ¶ 4; Bukhari Dep. at 18–19; Benninger Dep. at 13,

14   ECF No. 31-9.  The Fresno VA wanted an in-house infectious disease practitioner for a variety of

15   reasons, including its hope that an in-house physician would shorten waiting times for patients

16   and improve medical care in general.  Wallace Dep. Ex. 1 ¶ 7; Benninger Dep. at 14.

17       Administrators initially explored the possibility of a shared position with UCSF.  Under

18   one proposal, for example, the UCSF system would hire a new infectious physician, but the

19   Fresno VA would fund the majority of the new hire's salary and benefits.  *See* Nassar Indiv. Dep.

20   at 51–52, ECF No. 37-8; Meeting Mins. (Nov. 14, 2019), ECF No. 31-7.  That proposal did not

21   materialize.  *See* Nassar Indiv. Dep. at 51–52; Nassar Decl. ¶ 7, ECF No. 32-3.  The Fresno VA

22   ultimately decided to create and fund a position on its own; it posted a job opening in late 2018.

23   *See* Libraty Dep. at 31; *id.* Ex. 3 at 13, ECF No. 31-4.[3]  According to the posting, the new

---

[2] *See* https://www.va.gov/central-california-health-care/about-us/mission-and-vision/ (visited Sept. 26, 2025).  The court takes judicial notice of this basic background information, which is publicly available and subject to no dispute.  *See* Fed. R. Evid. 201; *see also, e.g.*, *Waln v. Dysart Sch. Dist.*, 54 F.4th 1152, 1164 n.11 (9th Cir. 2022) (taking judicial notice of undisputed information displayed publicly on government website).

[3] The court has followed the parties' convention of citing Bates-numbered pages in deposition exhibits and other discovery documents, omitting the prefixes and any leading zeros.

1   physician would be responsible for consulting with patients in a clinical setting at the Fresno

2   VA's facilities.  *See* Libraty Dep. Ex. 3 at 3.  But the new physician also would need to secure a

3   faculty appointment at UCSF.  *See id.*

4          Several people were responsible for interviewing and hiring candidates: Charles

5   Benninger, the director of the Fresno VA; Dr. Cynthia Wallace, acting chief of staff at the time;

6   Dr. Nasreen Bukhari, deputy chief of staff at the time; and Dr. Arnag Samim, then the acting

7   chief of internal medicine, who would be the new doctor's direct supervisor.  *See* Benninger Dep.

8   at 13–14, 36; Wallace Dep. at 14–17 & Ex. 1 ¶¶ 1–3, 10; Bukhari Dep. at 10; Libraty Dep at 67.

9   No UCSF infectious disease physicians were involved in interviews or the hiring decision.  *See*

10  Wallace Dep. at 41.

11         Libraty applied for the job.  *See* Libraty Dep. at 23 & Ex. 1 at 333.  For the previous

12  twenty years or so, he had worked in the University of Massachusetts hospital system, primarily

13  in a research and teaching position.  *Id.* at 22; *see also* Libraty Application Packet at 10, ECF No.

14  37-17 (copy of curriculum vitae).  Clinical work—seeing patients—had never comprised the

15  majority of his work at the university.  Libraty Dep. at 22.  He had spent about fifteen percent of

16  his time on clinical work at most.  *See id.* at 23.  Since 2012, he had not been able to devote any

17  of his time to clinical practice.  That was one of the consequences of his spontaneous cerebellar

18  hemorrhage.  *Id.* at 21.  After the hemorrhage, he was unconscious for a month, and he was

19  bedridden for four and half months as he received treatment at various hospitals.  *Id.*  Since then,

20  his recovery has been "very long," as he put it at deposition.  *Id.*  He continued working at the

21  university remotely, sometimes from his bed, before he eventually returned to the office.  *Id.* at

22  22.  Eventually his condition improved enough for him to attend case and research conferences,

23  too, but he did not see patients.  *See id.*  He continued his research and other "desk work."  *Id.*  In

24  2018, when he applied for the job in Fresno, he had regained his mobility, but he had imbalance

25  and weakness in his lower extremities, and he used a walker and a cane.  *Id.* at 23.

26         Libraty described this history briefly in a cover letter accompanying his application.  *See*

27  *id.* at 23; *see also* Libraty Application Packet at 9 (copy of cover letter).  He explained he had

28  been "slowly recovering" from a hemorrhage for several years.  Libraty Application Packet at 9.

1    "Due to this medical catastrophe," he wrote, "there is a gap seen for some of the activities listed

2    on my CV." *Id.* "I have now reached a stage where my clinical and teaching activities can return

3    to their previous levels." *Id.* Libraty understood at the time that clinical work would make up 80

4    to 90 percent of his time if he got the job at the Fresno VA. Libraty Dep. at 23. He did not

5    believe his disability affected his ability to do that job, assuming he were given reasonable

6    accommodations to ensure he could get from his car to the hospital and from one patient to the

7    next, for instance. *See id.* at 23–24. In his letter, he requested "some simple accommodations in

8    order to conduct the inpatient and outpatient clinical responsibilities," but nothing more. Libraty

9    Application Packet at 9.

10    After an initial phone call, the Fresno VA invited Libraty to interview for the position in

11    person in June 2019. Libraty Dep. at 24–25. He attended and used a walker to get around. *Id.*

12    As far as Libraty remembers, no one asked him about his disability, nor was it "explicitly

13    discussed," but he does recall that Wallace mentioned she would need to create a "proctoring" or

14    "reentry plan" for him if he were eventually hired, as he had not seen patients in a clinical setting

15    for several years. *Id.* at 25, 42, 70–71; *see also* Wallace Dep. at 47–48 (discussing reentry plans).

16    Wallace's references to a proctoring or reentry plan stemmed from the VA's requirements for

17    physician "credentialing" and "clinical privileging." Libraty Dep. at 70–71; Wallace Dep. at 47–

18    48. That second term, "clinical privileging," refers to a process the VA uses to confirm that the

19    doctors and other professionals it hires are licensed, legally permitted and competent to treat

20    patients and otherwise practice independently, i.e., without supervision or direction by another

21    professional. *See* Correa 30(b)(6) Dep. at 26–31 & Ex. 2 ¶ 2.e, ECF No. 31-6. When a doctor

22    has not treated patients for a year or more, the VA requires a "reentry plan." *Id.* at 56–57. As

23    part of a reentry plan, a doctor returning to clinical practice is "proctored," i.e., "reviewed closely

24    by other peers of the same specialty and equivalent to what [the returning doctor is] doing." *Id.*

25    In short, because Libraty had not seen patients for several years, another infectious disease

26    specialist would need to check his work for some time if he were in fact hired and came to work

27    at the Fresno VA. *See* Wallace Dep. at 49–50.

4

While recognizing the likely necessity of a reentry plan in Libraty's case, the VA decided to make him an offer. *See* Libraty Dep. at 47–49 & Ex. 9. It sent him a formal offer letter in July 2019. *Id.* The letter makes clear the offer was "tentative." *See id.* Ex. 9 at 1 (emphasis omitted). Both his start date and his ultimate selection depended on his successful completion of several requirements, including a background check, a confirmation of his credentials, and a review of his education, certifications, licensure and experience. *Id.* at 3. There is no dispute but that the Fresno VA was satisfied it could accommodate Libraty's use of a walker or cane, and all agree his hemorrhage had left him with no cognitive or mental disabilities that might have prevented him from doing the job. *See* Libraty Dep. at 107, 113, 118 & Ex. 1.

Developing a reentry plan, however, turned out to be a more difficult task than the Fresno VA had initially anticipated. Libraty would have been the first and only in-house infectious disease physician at the Fresno VA, so there were no local VA doctors who could supervise his reentry; the Fresno VA would need to look elsewhere for a physician who could serve as a proctor. *See* Libraty Dep. at 54; Correa 30(b)(6) Dep. at 57.

The VA turned first to UCSF, with whom it had an established relationship. *See* Wallace Dep. at 50–51. Wallace thought Libraty could work with the UCSF infectious disease doctors and fellows who already were coming to the Fresno VA to see and evaluate patients. *See id.* at 51. Over time, Wallace imagined, Libraty could take on greater and more independent responsibilities, and she thought he could do so without disrupting the Fresno VA's relationship with UCSF. *See id.* at 51–52.

Wallace presented this plan to Dr. Naiel Nassar, the chief of infectious disease at UCSF. *See* Wallace Dep. at 57–58; Nassar Decl. ¶¶ 1, 17–21. Nassar rejected it outright. *See* Wallace Dep. at 58 & Ex. 1 ¶¶ 14–16. His deposition testimony and emails from that time suggest that his rejection stemmed in part from the Fresno VA's decision not to consult with him and others at UCSF before moving forward with plans to hire an in-house infectious disease specialist. Nassar's emails also emphasized that Libraty had not worked in a clinical practice for several years. In one email to Wallace, for example, Nassar expressed frustration that he and others at UCSF had not been consulted before the Fresno VA made Libraty an offer, and he expressed his

5

1   belief that Libraty would need "extensive proctoring that will NOT meet the [accreditation]

2   requirement and the UCSF faculty appointment rules."  Libraty Dep. Ex. 14 at 78, ECF No. 31-4.

3   He put it similarly in his deposition: "All along I made it very clear we are not going to be

4   involved," because "Dr. Libraty was hired without consulting with us . . . ."  Nassar Dep. at 66.

5          Wallace believed there was a financial element to Nassar's refusal as well: if the Fresno

6   VA went forward with its plan and hired its own infectious disease specialist, then UCSF would

7   "lose their contract" with the Fresno VA, along with the associated "revenue stream."  Wallace

8   Dep. at 50, 58.  Wallace tried to reassure Nassar the Fresno VA would continue to work with

9   UCSF, as it could not rely on Libraty alone, but that did not change Nassar's position.  *See id.* at

10  59–60.

11         Other evidence could show the Fresno VA's relationship with UCSF and Nassar was

12  already rocky and had been for some time.  The minutes of a later meeting, for example, record

13  Nassar's frustration that previous Fresno VA administrators had blamed him and other UCSF

14  doctors for increases in patient mortality rates but had offered no evidence or data connecting

15  those increases to UCSF.  *See, e.g.*, Meeting Mins. (Nov. 14, 2019), ECF No. 31-7.

16         Whatever the reason, help from UCSF was not forthcoming, so Wallace began looking

17  elsewhere for an infectious disease practitioner who could serve as Libraty's proctor.  *See*

18  Wallace Dep. at 63.  She asked other VA chiefs of staff in the region.  *See id.*  A doctor in the

19  New Mexico VA arose as a possibility, *see* Wallace Dep. Ex. 1 ¶ 18, but Wallace testified in her

20  deposition that this doctor was not an infectious disease specialist and so could not fill the

21  proctor's role, *see* Wallace Dep. at 83.  Bukhari, by contrast, who later took over the search, as

22  explained in more detail below, came to a different understanding about why the New Mexico

23  VA could not help.  *See* Bukhari Dep. at 40–41.  By her understanding, the New Mexico VA had

24  not actually offered any of its physicians as proctors; its chief of staff had understood incorrectly

25  that the Fresno VA was looking for an "ongoing professional practice evaluation."  *See id.* at 41–

26  42.  That type of evaluation is "totally different" and a much less "intensive" evaluation than a re-

27  entry program.  *Id.* at 42–43.  Bukhari concluded the New Mexico VA could not help with a more

28  intensive reentry plan.  *See id.* at 41–43.

The Fresno VA's search for a proctor was further complicated when, mid-way through her search, Wallace was "removed" from her duties as chief of staff, and others had to step into her place. *See* Wallace Dep. at 66 & Ex. 1 ¶ 22. The Fresno VA states without citations to the record that Wallace was removed "over concerns that she was failing in her role as Chief of Staff to provide a collegial and supporting working relationship between hospital management and staff." VA Mem. at 10, ECF No. 31-1. Whatever the reason, it is not relevant for purposes of this order.

For some time, neither Wallace nor any other Fresno VA personnel informed Libraty the Fresno VA was having difficulty arranging for a proctor and creating a viable reentry plan. A few days before the tentative start date on his offer letter, Libraty emailed a human resources assistant at the Fresno VA to ask if he should plan on coming in, and if so, where he should report to. *See* Libraty Email (Oct. 11, 2019), ECF No. 37-29. He did not receive an answer. *See id.* He asked again by email, three days after his tentative start date had passed. *See* Libraty Email (Oct. 18, 2019), ECF No. 37-29. Eventually he heard back from a different HR representative that the Fresno VA did not yet have a reentry plan, so he could not begin work. *See* Strack Email (Oct. 23, 2019), ECF No. 37-29.

In November, the month after Libraty's original start date, Dr. Ivan Correa (the interim chief of staff who stepped into Wallace's position) and Charles Benninger (the Fresno VA's medical director) met with Nassar and others. *See* Meeting Mins. (Nov. 14, 2019). According to the minutes of that meeting, Correa and Benninger wanted to apologize and smooth over the VA's relationship with Nassar and UCSF, among other reasons so that UCSF might be more willing to help with Libraty's reentry plan. *See, e.g.*, Meeting Mins. (Nov. 14, 2019) at 985. Nassar said in response that he had seen Libraty's CV, which he agreed was "very good," but he repeated his concerns that Libraty had "been out of practice for almost 8 years." *Id.* at 986. Correa agreed there would be "a year at least" before Libraty was "back to full practice" and reassured Nassar the Fresno VA would continue to rely on its relationship with UCSF, both during that year and even after Libraty was "fully integrated into medical practice." *Id.*

Correa then invited Libraty to meet with him and Bukhari in person at the VA hospital; Libraty had moved to Fresno by this time. *See* Libraty Dep. at 82–83, 85. Correa apologized to

1    Libraty that his start date had been delayed and explained that the Fresno VA was still putting

2    together a reentry plan.  *See id.* at 83–84.  Correa did not explain that UCSF had refused to help,

3    but he said Libraty's start date would probably need to be delayed until December.  *See id.*

4    Libraty agreed.  *See id.*  But then Libraty did not start in December either.  Correa did not finalize

5    an internal reentry plan until the end of that month.  *See* Correa Dep. at 58–59 & Ex. 10.  And

6    before he could forward the internal plan to UCSF, he left his position, too.  *See* Bukhari Dep. at

7    25–26.  Bukhari, who took over for Correa, then forwarded the proposal to Nassar, who after

8    some delays responded that he had not agreed to the proposal and had not even discussed it with

9    Correa.  *Id.* at 26.  Meanwhile, Bukhari also continued her predecessors' efforts to solicit the

10   assistance of VA administrators around the region and the whole country as well, but as before,

11   her efforts were unsuccessful.  *See id.* at 40–42.

12         Bukhari spoke to Libraty over the phone in early January to explain she was still working

13   on a reentry plan because UCSF had not agreed to help, and she scheduled another meeting with

14   Libraty in person.  *See* Libraty Dep. at 71, 87.  They eventually met in mid-January, and Bukhari

15   proposed a "mini residency" or "mini fellowship" in Nevada or another state.  *See* Bukhari Dep.

16   at 53–58; Libraty Dep. at 71–72.  Libraty said that would not work.  "I was getting tired of the

17   runaround," he explained in his deposition.  Libraty Dep. at 72.  "I have a physical disability, and

18   I was very far into my senior clinical practice."  *Id.*  In a later email, Libraty proposed an

19   alternative plan in which he would "shadow" other physicians and write summaries for other

20   infectious disease specialists to review, but that proposal fell short of what Bukhari understood

21   was necessary under the VA's regulations.  *See* Bukhari Dep. at 59–60; Libraty Email (Jan. 14,

22   2020), ECF No. 37-32.

23         Bukhari also spoke to Nassar again in late January.  *See* Bukhari Dep. at 65.  Nassar again

24   declined her request to help proctor Libraty.  *See id.*; Nassar Email (Jan. 30, 2020), ECF No. 37-

25   33.  "Unfortunately," he explained in an email, "due to our understaffing," the UCSF infectious

26   disease specialists "declined to take on this added responsibility."  *Id.*  "I will get back to you

27   when we add new faculty, hopefully soon."  *Id.*

8

By this point, it was February 2020, several months after Libraty's original October start date. *See* Benninger Dep. at 55–56 & Ex. 5, ECF No. 31-9. He wrote to Benninger to express his frustrations. *See id.* Ex. 5. Libraty said he could not "remain in limbo indefinitely" and would "start to pursue the legal remedies available to [him] to resolve the situation." *Id.* Benninger responded that the Fresno VA was "diligently working on a plan to get a proctor for you in order for you to get fully credential[ed]" and hoped to have "some information soon." *Id.* Ex. 6. But a few days later, after consulting with HR staff, Benninger decided to revoke Libraty's tentative offer. *See id.* at 61–65 & Ex. 7. According to an email and letter Libraty received from an HR representative, the Fresno VA rescinded its offer because he had not passed the "credentialing and privileging process." *See* Libraty Dep. at 85–86 & Ex. 17.

Libraty then filed this case. *See generally* Compl., ECF No. 1. His complaint includes claims against both the Fresno VA, asserted against the Secretary of Veterans Affairs in his official capacity, and against UCSF, asserted against the Regents of the University of California. He alleges both entities discriminated against him and failed to accommodate his disability. *See id.* ¶¶ 49–66 (alleging discrimination in violation of federal Rehabilitation Act of 1973 against both defendants); *id.* ¶¶ 67–81 (alleging failure to accommodate disability in violation of Rehabilitation Act against both defendants); *id.* ¶¶ 82–94 (alleging discrimination in violation of California Fair Employment and Housing Act (FEHA) against UCSF); *id.* ¶¶ 95–107 (alleging failure to accommodate in violation of FEHA against UCSF).

After discovery closed, all three parties sought summary judgment or partial summary judgment. The Fresno VA and UCSF each seek summary judgment of all of the claims against them. *See generally* VA Mot., ECF No. 31; VA Mem., ECF No. 31-1; UCSF Mot., ECF No. 32; UCSF Mem., ECF No. 32-2. Libraty seeks partial summary judgment of one of UCSF's affirmative defenses. *See generally* Libraty Mot., ECF No. 30; Libraty Mem., ECF No. 30-1. Briefing is now complete. *See generally* Opp'n to VA Mot., ECF No. 37; VA Reply, ECF No. 39; Opp'n to UCSF Mot., ECF No. 36; UCSF Reply, ECF No. 40; Opp'n to Libraty Mot., ECF No. 35; Libraty Reply, ECF No. 41. The court heard oral arguments on June 26, 2025. Kellee

1  Kruse appeared for Libraty, Jeffrey Lodge appeared for the VA, and Michael Bruno appeared for

2  UCSF.

3  **II.    CLAIMS AGAINST THE FRESNO VA**

4          The court begins with the claims against the VA.  Section 504 of the Rehabilitation Act

5  prohibits discrimination, "solely by reason of" disability, by federal executive agencies, such as

6  the VA.  29 U.S.C. § 794(a).  In cases of alleged employment discrimination, the same

7  substantive standards apply to a section 504 claim as would apply to a claim under the Americans

8  with Disabilities Act of 1990 (ADA), so courts commonly consider decisions interpreting both

9  laws in Rehabilitation Act cases.  *See* 29 U.S.C. § 794(d); *Coons v. Sec'y of the U.S. Dept. of*

10  *Treasury*, 383 F.3d 879, 884 (9th Cir. 2004).  In general, a plaintiff who asserts a claim under the

11  ADA must prove discrimination "on the basis of" or "because of" a disability under a "but-for"

12  standard of cause and effect.  *See* 42 U.S.C. § 12112(a); *Murray v. Mayo Clinic*, 934 F.3d 1101,

13  1103 (9th Cir. 2019).

14          It is unclear whether discrimination "solely by reason of" a disability is a narrower

15  conception than discrimination "on the basis of" a disability.  The Ninth Circuit and Supreme

16  Court appear not to have decided whether those standards differ, at least not in any published

17  opinions the court has identified.  Other federal circuit courts have published conflicting opinions.

18  *See, e.g.*, *Natofsky v. City of New York*, 921 F.3d 337, 345 & n.1 (2d Cir. 2019) (disagreeing with

19  *Soledad v. U.S. Dep't of Treasury*, 304 F.3d 500, 504–05 (5th Cir. 2002)).  It is not necessary to

20  resolve any possible difference in this case.  As explained below, Libraty has not cited evidence

21  that could permit him to prove discrimination even under the more lenient "because of" standard.

22          Before the court moves to that standard, Libraty proposes a different test.  He urges the

23  court to consider instead whether he could prove his disability was one "motivating factor"—

24  perhaps among many—behind the decision to revoke his offer.  *See, e.g.*, Opp'n to VA Mot. at 17

25  & n.2; Opp'n to USCF Mot. at 19.  He relies primarily on the Ninth Circuit's decision in *Murray*,

26  cited above.  *See, e.g.*, Opp'n to VA Mot. at 17 & n.2 (citing 934 F.3d 1101).  In *Murray*, the

27  Ninth Circuit held "ADA discrimination claims under Title I must be evaluated under a but-for

28  causation standard."  934 F.3d at 1107.  In other words, "an ADA discrimination plaintiff

1    bringing a claim under 42 U.S.C. § 12112 must show that the adverse employment action would

2    not have occurred but for the disability." *Id.* at 1105.  The Circuit expressly rejected the

3    "motivating factor" test Library now asks this court to employ.  *See id.* at 1105–07 (citing and

4    analyzing *Gross v. FBL Fin. Servs, Inc.*, 557 U.S. 167 (2009) and *Univ. of Tex. Sw. Med. Ctr. v.*

5    *Nassar*, 570 U.S. 338 (2013)).  The court therefore declines to apply the "motivating factor" test.

6         The basics of an employment discrimination claim under section 504 are well known and

7    undisputed.  It ultimately would be Libraty's "prima facie" burden to prove at trial that he is a

8    person with a disability, that he was qualified for the job, and that he suffered discrimination

9    "solely by reason of" or "because of" his disability.  *See Mustafa v. Clark Cnty. Sch. Dist.*,

10   157 F.3d 1169, 1174 (9th Cir. 1998).  At this stage, however, Libraty need not prove his claims

11   conclusively; he need only cite evidence that could support his claims at trial.  *See Celotex Corp.*

12   *v. Catrett*, 477 U.S. 317, 325 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos., Inc.*, 210 F.3d

13   1099, 1103 (9th Cir. 2000).  If he offers the necessary record citations, the Fresno VA would need

14   to respond by citing evidence that could prove it had a legitimate, nondiscriminatory reason for its

15   actions.  *See Lucero v. Hart*, 915 F.2d 1367, 1371 (9th Cir. 1990).  If so, the VA would be entitled

16   to summary judgment unless Libraty replied in turn with citations to evidence that he could use to

17   prove at trial the VA's reason was pretextual.  *See Mustafa*, 157 F.3d at 1176.

18        The VA argues persuasively that Libraty has not shown he can prove he suffered

19   discrimination "solely by reason" of his disability.  *See* VA Mem. at 19–20.  The VA contends

20   similarly, and with similarly persuasive force, that it rescinded his offer due to his years-long

21   absence from clinical practice and its failure to find an infectious disease specialist to serve as a

22   proctor, not because of his disability.  *See id.* at 20–21.  The VA's arguments rely on a line of

23   cases in which courts have distinguished disability discrimination from the imposition of neutral

24   standards that, for one reason or another, weigh more heavily on those with disabilities.

25        For example, in *Matthews v. Commonwealth Edison Co.*, a frequently cited opinion in an

26   ADA case, the defendant company had decided to discharge several of its employees as part of a

27   "reduction in force."  128 F.3d 1194, 1195–97 (7th Cir. 1997).  The company's management

28   ranked its employees based on the quality and quantity of the work they had completed over the

past year, and it discharged the lowest-scoring employees. *See id.* at 1197. One employee had

been out of the office for a good part of the previous year due to a serious medical problem, and

so he scored poorly. *See id.* Firing that employee might very well have been cruel and short-

sighted. *See id.* at 1197–98. But it was not illegal disability discrimination. Even if the

employee's absence from work was the consequence of a "disability," his discharge was not

"because of" that disability itself, so the company was entitled to summary judgment. *See id.*

The employee could potentially have prevailed under a different theory, for example by proving

management was "us[ing] the occasion as a convenient opportunity to get rid of its disabled

workers." *Id.* at 1195. Or he might have prevailed by showing the scoring system fell heavily

onto the backs of employees with disabilities and was justified by no business need. *See id.* at

1195–96. He did not make such a claim, however, and, without evidence of pretext or unjustified

disproportionate effects, he could not prove the company had violated the law. *See id.* at 1197–

98.

   The Ninth Circuit relied on similar reasoning in *Collings v. Longview Fibre Co.*, 63 F.3d

828 (9th Cir. 1995), another ADA case. The defendant operated a box manufacturing factory. *Id.*

at 830. It had "large, fast-moving machinery" in this factory, which posed risks of serious injury

if handled improperly. *Id.* at 830. For that reason, and because federal law required its factory to

be "drug-free," it strictly prohibited drug use on the job. *Id.* at 830 & n.1. A conflict arose after

an internal investigation led management to believe several employees had used marijuana. *See*

*id.* at 830–31. When the company confronted these employees, some admitted they had used

marijuana in the past, but said they were no longer using marijuana, and certainly not on the job.

*See id.* at 832. Some also said they were in rehabilitation programs or had completed a

rehabilitation program. *See id.* One man claimed he had never used drugs at all and was simply

perceived—quite wrongly—to be a drug user. *Id.* at 833–34. On these points the evidence was

conflicting. *See id.*

   Despite that genuine dispute, the district court granted the company's motion for summary

judgment, and the Ninth Circuit affirmed. *See id.* at 831, 833–34. Even if the company had been

mistaken—even if the discharged employees had never been under the influence of marijuana on

1    the job and had never brought drugs into the factory—the company had cited workplace

2    misconduct as the reason for their terminations, not a disability, such as a substance use disorder.

3    *See id.* at 834–35.  There was no evidence to show the company's explanation was a pretext for

4    discrimination against people with a drug dependency, either.  *See id.*  Because the ADA does not

5    prohibit discharges for workplace misconduct, even discharges based on mistaken conclusions

6    about suspected misconduct, the employees could not prevail.  *See id.*  That was true no matter

7    whether they had been diagnosed with a "medically cognizable" disability related to their past

8    drug use.  *See id.*

9         The Supreme Court itself does not appear to have applied the same reasoning in a case

10   under the Rehabilitation Act or ADA,[4] but it did adopt essentially the same rule in *Hazen Paper*

11   *Co. v. Biggins*, a case of alleged age discrimination.  *See generally* 507 U.S. 604 (1993).  In

12   *Hazen*, the defendant had fired the plaintiff, who was sixty-two years old at the time, for doing

13   business with a competitor.  *See id.* at 606.  The plaintiff alleged the company had actually fired

14   him because of his age.  *See id.*  Among other evidence, he pointed out the company had fired

15   him just a few weeks shy of the day when his pension would have vested.  *Id.* at 606.  A jury

16   found the company was liable under the Employee Retirement Income Security Act of 1974

17   (ERISA) and the Age Discrimination in Employment Act of 1967 (ADEA), and the court of

18   appeals affirmed those aspects of the judgment.  *Id.* at 606–07.

19        The Supreme Court granted certiorari to decide, among other things, whether "an

20   employer's interference with the vesting of pension benefits violate[s] the ADEA."  *Id.* at 608.

21   The Court said the answer was no.  *See id.* at 611–12.  The employee had alleged the company

22   had treated him differently because of his age, so that was the dispute the courts were to address,

23   not whether the company had relied on some neutral policy that fell more heavily and

24   unjustifiably on the backs of older workers.  *See id.* at 609–10.  For that reason, the employer's

25   liability depended on whether it was truly motivated by the plaintiff's age rather than some other

26   factor, even a factor "correlated with age, as pension status."  *Id.* at 610.  "Perhaps it is true," the

---

[4] The Supreme Court has suggested in dicta, however, that it would agree with the holdings summarized above.  *See Raytheon Co. v. Hernandez*, 540 U.S. 44, 55 n.6 (2003).

1    Supreme Court wrote, "that older employees . . . are more likely to be 'close to vesting' than

2    younger employees." *Id.* at 611–12.  Even so, firing workers who are close to vesting would not

3    be age discrimination in and of itself.  *Id.* at 612.  That "decision would not be the result of an

4    inaccurate and denigrating generalization about age, but would rather represent an accurate

5    judgment about the employee—that he indeed is close to vesting." *Id.* (emphasis omitted).  This

6    is not to say an employer could legally fire an employee to avoid pension liability.  *See id.* at 612.

7    Nor could an employer use pension status as a stand-in for age.  *See id.* at 612–13.  A plaintiff can

8    prove discrimination by showing an employer's explanation is "unworthy of credence," if the

9    employee actually makes that proof.  *Id.* at 613 (quoting *U.S. Postal Serv. Bd. of Governors v.*

10    *Aikens*, 460 U.S. 711, 716 (1983)).

11           Together, these and other decisions teach that employers do not violate section 504 of the

12    Rehabilitation Act simply by relying on a particular employee's actual qualifications and

13    limitations, even if those qualifications and limitations are the consequences of a disability or

14    otherwise related to a disability.  *See, e.g.*, *Brumfield v. City of Chicago*, 735 F.3d 619, 631

15    (7th Cir. 2013) ("The Rehabilitation Act protects qualified employees from discrimination 'solely

16    by reason of' disability, meaning that if an employer fires an employee for any reason other than

17    that she is disabled—'even if the reason is the consequence of the disability'—there has been no

18    violation of the Rehabilitation Act." (quoting *Matthews*, 128 F.3d at 1196)); *Gillen v. Fallon*

19    *Ambulance Serv., Inc.*, 283 F.3d 11, 28–29 (1st Cir. 2002) ("[A]n employer may refuse to hire a

20    prospective employee because she is unable to do the job, even though a [disability] lies at the

21    root of that inability.").

22           For Libraty's claims, then, the question is not whether the Fresno VA revoked his offer

23    because he had not seen patients for several years or because of the "gap" in his practice.  It is not

24    whether his disability is what prevented him from seeing patients or was the cause of the "gap."

25    It is not whether, as he puts it, "the gap in clinical practice, caused solely because of [his]

26    disability, makes [him] unqualified."  Opp'n to VA Mot. at 9.  The proper question given the law

27    is whether the VA or UCSF decided to revoke the offer "solely by reason of" or "because of" his

28    disability itself.

1    Libraty has not cited evidence that he could use at trial to prove his disability is what

2    spurred the VA to revoke his offer.  The record amply documents the story of that revocation: the

3    gap in his clinical practice, his otherwise excellent qualifications, the VA's desire to bring him on

4    board and to create a reentry plan, Nassar's and UCSF's repeated refusals to help, and the Fresno

5    VA's long running but ultimately unsuccessful attempts to finalize a viable plan.  Libraty makes

6    no claim in this lawsuit that the VA's clinical and reentry requirements actually targeted

7    applicants with disabilities, that those requirements fall more heavily on candidates with

8    disabilities, or that they were unjustified by any medical or business necessity.  Nor has he cited

9    evidence that could support such a claim.  It is undisputed, in fact, that reentry plans are a routine

10   requirement for those who have been out of clinical practice for a long time.  *See, e.g.*, Libraty

11   Dep. at 69–71; Opp'n VA Mot. at 14.

12       Nor has Libraty cited evidence to show the VA's explanation for its decision was a

13   pretext.  No evidence shows, for example, that anyone who worked at the Fresno VA or UCSF

14   thought or spoke less of Libraty because of his disability.  Libraty does point out that the VA

15   created reentry plans for other practitioners, and none of these other practitioners had a disability.

16   *See* Opp'n to VA Mot. at 19–20.  He contends the only difference between him and these other

17   successfully reentering professionals was his disability.  *Id.* at 19.  In reply, however, the VA does

18   offer another reason, and the evidence supports that claim beyond any genuine dispute: "The

19   difference between Dr. Libraty and other re-entry candidates was the availability of a proctor, not

20   a disability."  VA Reply at 10.  The other practitioners shared specialties with others within the

21   Fresno VA itself, so finding a proctor and creating a reentry plan was a much simpler task.  *See*

22   *id.* at 9–10.  Libraty cites no evidence showing otherwise.

23       Beyond the revocation of his offer, Libraty claims the VA and UCSF discriminated

24   against him by refusing to accommodate his disability.  *See* Compl. ¶¶ 67–81.  He argues the VA

25   and UCSF should have offered him a reentry plan as a reasonable accommodation for his

26   disability.  *See* Opp'n VA Mot. at 11–17.  Generally speaking, a prospective employer's failure to

27   make reasonable accommodations is discrimination in violation of Rehabilitation Act.  *See*

28   *Vinson v. Thomas*, 288 F.3d 1145, 1154 (9th Cir. 2002); 28 C.F.R. § 35.130(b)(7)(i).  But for at

1    least three reasons, Libraty could not prove the Fresno VA failed to accommodate his disability in

2    violation of the Rehabilitation Act.

3          First, the reentry plan was not an accommodation for a disability.  Libraty does not allege

4    his disability prevented him from treating patients or from working in a clinical practice.  Both

5    the VA and Libraty believed he could have treated patients in a clinical setting with only "simple

6    accommodations" necessary to ensure he would get from place to place while on the job.  Libraty

7    Application Packet at 9; *see also* Libraty Dep. at 24 (describing necessary accommodations).

8    Rather than an accommodation for a disability, his successful completion of a reentry plan was a

9    term or condition of his employment.  No matter the reason for the gap in his clinical practice—

10   military service, foreign travel, family needs, disability, a change in personal interest or

11   something else—the Fresno VA still would have required all applicants to meet its credential and

12   privilege requirements, with a reentry plan if necessary.  In this sense, Libraty's accommodation

13   claim falls short for the same reason as his broader discrimination claim: just as the VA's

14   decision to rescind Libraty's offer was not "solely by reason of" his disability, the reentry plan

15   was not an accommodation for his disability.  The moving force in both instances was the gap in

16   Libraty's clinical practice, not his disability.

17         Second, the result would be the same even if the reentry plan were an "accommodation"

18   for a disability.  Libraty has not explained how he could prove the VA failed to accommodate

19   him.  The Fresno VA proposed the disputed reentry plan of its own accord.  It then attempted to

20   create a viable plan for months.  Rather than arguing the VA refused his requests for a reentry

21   plan or failed to consider a reentry plan, Libraty contends the Fresno VA wanted to create a

22   reentry plan and attempted to create a reentry plan but did not try hard enough.  If the Fresno

23   VA's administrators had been competent and diligent, he argues, finding a proctor would have

24   been "easy."  Opp'n VA Mot. at 14.  He cites no statutory provision, regulation or case to support

25   this argument.  The court is aware of no law or case under which an employer would violate the

26   Rehabilitation Act by attempting to accommodate but doing so unsuccessfully or ineptly.

27         In any event, as detailed at length in the background section above, the factual record

28   shows beyond dispute that the VA did attempt for months to find a willing and qualified proctor.

1    At least three chiefs or interim chiefs of staff and other administrators attempted without success

2    both to persuade UCSF to help and to find other qualified VA physicians to serve as proctors.

3    Libraty cites just one source to support his claims to the contrary: a few pages from the transcript

4    of the deposition of Cynthia Wallace, the former chief of staff who helped to recruit him in the

5    first place. *See id.* (citing Wallace Dep. at 80–84). But Wallace tried—and failed—to create a

6    viable reentry plan before she vacated her position. Wallace Dep. at 80–84. Although she did

7    express her belief, in retrospect, that finding a proctor within the broader VA system should have

8    been "fairly easy," *id.* at 81, and although she claimed to have later found a potential proctor, *see*

9    *id.* at 80–81, she could not remember who that person was, *see id.* at 81, and she did not claim to

10   have actually made any concrete plans for the unknown person's providing assistance. No party

11   has cited any portion of the record to corroborate Wallace's memories or to shed any light on who

12   the person might have been. Wallace's brief and inconclusive testimony does not create a

13   genuine dispute of material fact. *See FTC v. Stefanchik*, 559 F.3d 924, 929 (9th Cir. 2009) ("A

14   non-movant's bald assertions or a mere scintilla of evidence are both insufficient to withstand

15   summary judgment.").

16        Third, when Wallace proposed a reentry plan to Libraty based on the unknown potential

17   proctor's assistance, he rejected the offer. *See* Wallace Dep. at 82–84; Libraty Dep. at 107–09.

18   He also rejected other alternatives the VA presented, such as the "mini fellowship" discussed in

19   the background section above. *See* Libraty Dep. at 71–72, 108–09; *see* Bukhari Dep. at 53–58.

20   Even if the reentry plan were a reasonable accommodation, and even if the VA had created a

21   viable plan, Libraty has not cited evidence to show he would have accepted it.

22        For these reasons, the court grants the Fresno VA's motion for summary judgment.

23   **III.    CLAIMS AGAINST UCSF**

24        **A.    Libraty could not show UCSF would have been his employer.**

25        UCSF's motion rests primarily on its argument that it would not have been Libraty's

26   employer if he had been hired. *See* UCSF Mem. at 7–11. Libraty does not disagree that if UCSF

27   would not have been his employer, then it cannot be liable, under the Rehabilitation Act or the

28   FEHA. *See* Opp'n UCSF Mot. at 8; *see also Fleming v. Yuma Reg'l Med. Ctr.*, 587 F.3d 938,

17

1    946 (9th Cir. 2009) (holding section 504 of Rehabilitation Act applies to "employers and

2    employees as defined in Title I of the ADA" and "independent contractors and the entities that

3    hire them"); *Kelly v. Methodist Hosp. of S. Cal.*, 22 Cal. 4th 1108, 1116 (2000) ("Only employers

4    are subject to FEHA.").  Nor does Libraty dispute he would bear the burden to prove at trial that

5    UCSF would have been his employer.  He contends instead a trial is necessary to resolve factual

6    disputes related to UCSF's status as a joint employer.  *See* Opp'n UCSF Mot. at 8–12.  The court

7    begins with the FEHA: would UCSF have been his "employer" under that law?

8         The FEHA includes an express statutory definition of "employer."  It means "any person

9    regularly employing five or more persons, or any person acting as an agent of an employer,

10   directly or indirectly, the state or any political or civil subdivision of the state, and cities."  Cal.

11   Gov't Code § 12926(d).  The definition also expressly excludes religious associations and

12   corporations not organized for private profit from this definition.  *Id.*  These definitions are

13   somewhat "limited," and California courts have devised a variety of tests for the closer cases.  *See*

14   *Vernon v. State of California*, 116 Cal. App. 4th 114, 124 (2004).  "The common and prevailing

15   principle espoused in all of the tests" is an investigation of "the totality of circumstances that

16   reflect upon the nature of the work relationship of the parties," with an emphasis on whether "the

17   defendant controls the plaintiff's performance of employment duties."  *Id.* (citation and quotation

18   marks omitted).  When the relationship in question is a joint employment relationship, "[t]here is

19   no magic formula."  *Id.* at 124–25 (citation and quotation marks omitted).  "Rather, the court

20   must analyze myriad facts surrounding the employment relationship in question."  *Id.* at 125

21   (citation and quotation marks omitted).  There are many factors to consider, from whether the

22   defendant pays for any of the plaintiff's salary and benefits, to whether the defendant owns any

23   equipment necessary for the work.  *See id.*  The "most important" factor is "the extent of the

24   defendant's right to control the means and manner of the workers' performance."  *Id.* at 126

25   (citation and quotation marks omitted).

26        Here the record shows beyond dispute that UCSF was not an employer under this test.

27   The VA posted its infectious disease position without consulting UCSF, and no UCSF personnel

28   reviewed Libraty's application or interviewed him before he received and accepted the VA's

offer.  *See* Wallace Dep. at 28–30, 41–42; Nassar Decl. ¶ 10.  No evidence shows UCSF would have had any responsibility for paying Libraty.  No evidence shows UCSF owned any relevant equipment or property at the VA facility where Libraty would have worked.  No evidence shows UCSF would have had authority over Libraty's day-to-day schedule.  No evidence shows UCSF would have had authority to discipline him or terminate his employment.  To the contrary, Nassar would testify at trial that UCSF did not own any relevant property or equipment and would not have had any obligation or authority to pay Libraty, set his schedule, supervise him or discipline him.  Nassar Decl. ¶¶ 8–15.

Libraty argues a trial is necessary because there are factual disputes about whether UCSF promised to pay a portion of his salary and benefits in exchange for having control over a fraction of his time on the job.  Opp'n UCSF Mot. at 11.  The source of an employee's pay and benefits and the defendant's control over the employee's time are relevant factors to consider.  *See Vernon*, 116 Cal. App. at 125–26.  But the evidence Libraty cites to support his position is about preliminary discussions that never came to fruition.  *See* Opp'n UCSF Mot. at 11 (citing Nassar Dep. at 51–52); Wallace Email (Apr. 18, 2019), ECF No. 36-14; *see also* Wallace Dep. at 31–33 (discussing these plans); Nassar Decl. ¶ 7 ("These discussions never came to fruition.").  Libraty has not cited evidence showing UCSF would have paid any portion of his salary or benefits in exchange for a fraction of his time.

Libraty also argues there is a genuine dispute about whether he would have been subject to UCSF's direction.  *See* Opp'n UCSF Mot. at 11.  Again, however, the evidence he cites to support that argument falls short.  First, he relies on an email from Nassar to Wallace.  *See id.* (citing Nassar Email (Aug. 30, 2019) at 94, ECF No. 36-19).  In the email, Nassar tells Wallace he believed Libraty was "not the best candidate to take [the] position" due to the "gaps" in his practice "and in light of his Board status."  Nassar Email (Aug. 30, 2019) at 94.  Nassar believed Libraty was not "board certified" in infectious diseases, which would "exclude him from teaching fellows."  *Id.*  For that reason, Nassar wrote he could not "send fellows to work with [Libraty] without direct UCSF Fresno ID [i.e., infectious disease] faculty supervision."  *Id.*  This email could not show Nassar anticipated UCSF would supervise Libraty, but rather would show Nassar

1  believed Libraty was not qualified to supervise UCSF fellows. *Id.* Second, Libraty relies on

2  Nassar's deposition testimony. *See* Opp'n UCSF Mot. at 11–12 (citing Nassar Dep. at 36). On

3  the cited transcript page, Nassar testified he could not ensure UCSF physicians would be

4  available to see patients during the periods when the VA had promised Libraty he could conduct

5  research rather than see patients. Nassar Dep. at 36. This testimony does not show UCSF had

6  authority to set Libraty's schedule, nor that UCSF expected or agreed to supervise or direct

7  Libraty's work.

8         Finally, Libraty argues more generically his "employment relationship with the Fresno

9  VA was directly impacted by UCSF's input." Opp'n UCSF Mot. at 12. He relies on Wallace's

10  deposition testimony. *See id.* (citing Wallace Dep. at 97). She testified that Benninger told her

11  that UCSF "had input into the withdrawal of [Libraty's] offer" and did not "want it." Wallace

12  Dep. at 97. The court assumes for purposes of this order that Wallace's second- and third-hand

13  testimony about what others said is accurate and could be reduced to an admissible form at trial.

14  Her testimony could not show UCSF had power to revoke his offer. It could show only that

15  UCSF was unwilling to help with a reentry plan. More generally, however, Libraty cites no

16  authority to show a defendant could be a joint employer simply because it had "input" or

17  contributed to a decision, and the court is aware of none. In sum, Libraty has not cited evidence

18  that could show at trial that UCSF would have been his joint employer under the California

19  FEHA, so he cannot prevail on his FEHA claim against UCSF.

20         Moving, then, to Libraty's federal claims and the Rehabilitation Act, the parties agree

21  federal courts have adopted two different tests for deciding whether a defendant was a joint

22  employer: (1) the "common law hybrid test," which attempts to discern whether, as a matter of

23  economic realities, the defendant was the plaintiff's employer, and (2) a test that depends only on

24  whether the defendant "retained for itself sufficient control over the terms and conditions of

25  employment." *Lopez v. Johnson*, 333 F.3d 959, 962–63 (9th Cir. 2003) (quoting *Redd v.*

1    *Summers*, 232 F.3d 933, 938 (D.C. Cir. 2000)).[5]  The parties also agree the Ninth Circuit and

2    Supreme Court have not decided in any controlling opinions which test district courts must use.

3    *See* UCSF Mem. at 10; Libraty Opp'n to UCSF Mot. at 8.

4              As in *Lopez*, it is not necessary to decide in this case, either.  Under both tests, UCSF

5    would not have been Libraty's joint employer.  As discussed above, the record shows beyond

6    dispute that the Fresno VA decided to hire an in-house infectious disease specialist without

7    consulting UCSF; it posted the job opening without notifying UCSF in advance; it interviewed

8    candidates without involving UCSF; it made an offer to Libraty without involving UCSF; Libraty

9    accepted the VA's tentative offer before UCSF knew he had applied; and the VA would have

10   paid for his salary and benefits.  No evidence shows UCSF would have had any authority to set

11   Libraty's schedule, promote him, discipline him, or discharge him.  The only factor that might

12   weigh in favor of a joint relationship was that Libraty was required to obtain a joint appointment

13   on the UCSF faculty before he could supervise UCSF fellows.  *See* Libraty Opp'n to UCSF Mot.

14   at 9.  Libraty has not cited evidence to show UCSF imposed this requirement rather than the

15   Fresno VA.

16           **B.      Libraty could not prove discrimination or failure to accommodate even if**
17                     **UCSF would have been his employer.**

18           Even if UCSF and the VA would have been Libraty's joint employers, however, he has

19   not cited evidence that could support his claims against UCSF at trial.

20           Starting again with the FEHA, to prove a claim of discrimination at trial, it would be

21   Libraty's burden to show he (1) suffered from a disability; (2) could perform the essential duties

22   of a job with or without reasonable accommodations; and (3) was subjected to an adverse

23   employment action because of his disability.  *See Zamora v. Sec. Indus. Specialists, Inc.*, 71 Cal.

24   App. 5th 1, 31 (2021).  The disability must have been a "*substantial* motivating factor, rather than

25   simply *a* motivating factor" behind the defendant's actions.  *Soria v. Univision Radio Los*

---

[5] Depending on how these tests are defined, there may actually be three choices.  *See Sibbald v. Johnson*, 294 F. Supp. 2d 1173, 1175–76 (S.D. Cal. 2003) (describing three tests and collecting relevant authority).

1    *Angeles, Inc.*, 5 Cal. App. 5th 570, 590 (2016) (quoting *Harris v. City of Santa Monica*, 56 Cal.

2    4th 203, 232 (2013)) (emphases in original).

3    An alleged failure to accommodate cannot serve as an adverse employment action for

4    purposes of a discrimination or retaliation claim. *See Doe v. Dep't of Corr. & Rehab.*, 43 Cal.

5    App. 5th 721, 735–36 (2019) ("No court has ever held that a failure to reasonably accommodate

6    an employee's disability . . . can qualify as the adverse action underlying a discrimination or

7    retaliation claim."). Libraty therefore cannot prove discrimination by arguing UCSF failed to

8    accommodate him by offering him a reentry plan.

9    A decision not to hire, by contrast, can be an "adverse employment action." *See Guz v.*

10    *Bechtel Nat. Inc.*, 24 Cal. 4th 317, 355 (2000). But Libraty has not cited evidence to show his

11    disability was a substantial motivating factor in UCSF's actions. As summarized above,

12    communications from Nassar and UCSF repeatedly and consistently attribute their decision to

13    other factors, such as the gap in Libraty's clinical practice, UCSF's exclusion from the VA's

14    hiring process, and concerns about the future of the relationship between UCSF and the VA. *See*

15    Nassar Decl. Exs. A, C, D, E. These concerns are "facially unrelated to prohibited bias" and

16    preclude "a finding of discrimination" under the decisions of California's appellate courts. *Guz*,

17    24 Cal. 4th at 358 (emphasis omitted). Libraty has not cited evidence to show at trial that these

18    explanations were a pretext, as would be necessary to prevail at trial. *See id.*

19    Libraty also alleges UCSF failed to accommodate him in violation of the FEHA, but that

20    claim suffers from the same basic problems as his claim the VA failed to accommodate him. As

21    explained above, the reentry plan was not a reasonable accommodation for a disability, but rather

22    a bridge over a gap in Libraty's clinical practice. Nor was Nassar's refusal to participate in

23    Libraty's reentry plan a failure to accommodate under the FEHA; the reentry plan was not created

24    with the purpose of accommodating Libraty's disability. *See Nadaf-Rahrov v. Neiman Marcus*

25    *Grp., Inc.*, 166 Cal. App. 4th 952, 974 (2008) (describing reentry plan as "a modification or

26    adjustment to the workplace that enables the employee to perform the essential functions of the

27    job held or desired.").

Again, even assuming the reentry plan were an accommodation, Libraty has not cited evidence to show UCSF and the VA—acting theoretically as a joint employer—refused to offer him a reentry plan. Although Nassar declined to participate in the reentry plan, *see* Nassar Email (Aug. 30, 2019) at 6, ECF No. 32-4, he did not reject the concept of a reentry plan; nor did UCSF or the VA. The record instead shows Nassar had no objections to a plan as long as someone "within the VA" serve as proctor. Nassar Email (Jan. 7, 2020) at 21–22, ECF No. 32-4. He also later expressed a willingness to help with a proctoring plan if UCSF's tight staffing situation improved. *See* Nassar Email (Jan. 30, 2020), ECF No. 37-33. As summarized above, the VA and UCSF—again considered here only theoretically as Libraty's joint employers—made multiple attempts to find a proctor for the proposed reentry plan, but could not find a qualified specialist who could serve as proctor.

In addition to his claims under the FEHA, Library asserts claims against UCSF under the Rehabilitation Act, but similar reasoning shows Libraty could not prove these federal claims at trial. As explained in the previous section, a plaintiff cannot prevail under the Rehabilitation unless he proves discrimination "solely by reason of" a disability, 29 U.S.C. § 794(a), and Libraty has not cited evidence that could meet that standard. Nassar and UCSF consistently and repeatedly said that staffing problems, concerns about the VA contract, their exclusion from the hiring process, and Libraty's ability to supervise fellows were the reasons for their decision, not a disability. *See* Nassar Decl. Exs. A, C, D, E. On the record before the court, these explanations are legitimate and nondiscriminatory. *See Mattioda v. Nelson*, 98 F.4th 1164, 1178–79 (9th Cir. 2024) (finding defendant not liable for disability discrimination under Rehabilitation Act when defendant declined to promote plaintiff for lack of "mission experience and publication impact"). Nothing in the record could be used to show these explanations were pretextual, as would be necessary for Libraty to prevail at trial. *See, e.g.*, *Coghlan v. Am. Seafoods Co. LLC.*, 413 F.3d 1090, 1095 (9th Cir. 2005); *Chuang v. Univ. of Cal. Davis, Bd. of Trs.*, 225 F.3d 1115, 1127 (9th Cir. 2000).

Libraty argues UCSF's explanations are baseless and were "constantly changing." Opp'n USCF Mot. at 19–21. The record shows otherwise, as summarized above. He argues similarly it

23

1    is "implausible that a hospital is so understaffed" that it would not have "five or ten minutes" to

2    accommodate him.  *Id.* at 20.  But he cites no portions of the record that could support this

3    argument, nor that the reentry plan would require only five or ten minutes of time to implement.

4    Libraty also argues Nassar had a discriminatory animus, citing an internal UCSF email in which

5    Nassar wrote he did not "want to be in violation of Americans with Disability [sic] Act."  Nassar

6    Decl. Ex. B; *see also* Opp'n at 19.  This statement cannot reasonably be interpreted as evidence of

7    animus or pretext.  Nassar was forwarding one of the VA's proposed proctoring plans to another

8    UCSF employee.  *See* Nassar Decl. Ex. B.  He told the recipient he would decline the proposal

9    because UCSF was "not involved in any part of this recruitment."  *Id.*  He then began a new

10   sentence: "However, I don't want to be in violation of the Americans with Disability Act."  *Id.*

11   He concluded his email with a request for his colleague's "counsel."  *Id.*  In short, Nassar

12   explained he could not support the proposed proctoring plan, cited a reason unrelated to Libraty's

13   disability, expressed an intent not to discriminate on the basis of disability, and asked for advice.

14          For these reasons, the court grants UCSF's motion for summary judgment.

15   **IV.    CONCLUSION**

16          Defendants' motions for summary judgment are **granted**.  Because the Fresno VA and

17   USCF are entitled to summary judgment on each of the claims Libraty asserts against them, his

18   motion for partial summary judgment is **denied as moot**.

19          This order resolves ECF Nos. 30, 31 and 32.  The Clerk's Office is instructed to **close the**

20   **case**.

21          IT IS SO ORDERED.

22    DATED:  October 2, 2025.

_____
SENIOR UNITED STATES DISTRICT JUDGE